**JUNGERSEN v. BADEN et al. (AXEL BROS., Inc., et al., Intervenors).**

District Court, S. D. New York.

Feb. 7, 1947.

Drury W. Cooper and John N. Cooper, both of New York City, and Karl W. Flocks, of Washington, D. C., for plaintiff.

Fish, Richardson & Neave, of New York City (John Vaughan Groner, and Robert B. Whittredge, both of New York City, of counsel), for defendants.

RIFKIND, District Judge.

In this patent infringement suit plaintiff seeks judgment for damages, profits and injunctive relief. The answers put in issue both validity and infringement and contain counterclaims for declaratory judgment adjudicating the validity of the patent.

The patent in suit is No. 2,118,468 issued to plaintiff on May 24, 1938, on an application filed September 28, 1934. It contains six claims of which the first five relate to a method of casting articles of jewelry of intricate design, and the sixth is for an article of jewelry produced by the method.

Claim 2 reads as follows: "2. A method of casting articles of jewelry of intricate design consisting in, first making a model of the article desired to be cast, then forming a primary mould in separable sections therearound of plastic material capable of assuming intimate contact with the intricate designs of the model and adapted to retain the assumed shape, then removing the model, then by centrifugal force projecting into the mould cavity and completely filling same a molten material of a low fusing point which will not injure the mould, then removing the fusible pattern so cast, then investing said pattern in a refractory material which will assume all the contours of its intricate design to form a secondary mould, then heat treating said investment removing the low fusing pattern therefrom, then by centrifugal force projecting molten metal into the heat treated mould, and finally removing said mould from the cast article."

Claims 1, 3, 4 and 5 describe variants of the method.

Claim 6 reads as follows: "6. An article of jewelry or a part thereof of a design intricate to the extent of having one or more small projections or depressions made by a process comprising first producing a model of the article to be cast, then forming about said model a primary mould, then removing the model from the primary mould, then introducing into the mould by force sufficient to deposit the material into the depression or depressions of the primary mould, molten wax or other material of low fusing point that will not injure the primary mould to form a pattern, and employing the pattern so made for the manufacture of a casting mould."

In the specifications the object and the several steps of the process are thus described:

"The principal object of this invention is to facilitate the casting of small metal articles, particularly articles of intricate detail such as jewelry which frequently are designed with hollows, undercut portions and perforations, so that they will have a smooth clean surface faithful in detail to the original and free from imperfections or holes, and to enable such result being accomplished with the minimum of expense.

"A further object of the invention is to enable the formation of intricate castings which will so closely resemble the original and finished product that the slow and tedious work of patterning and detail cutting required in connection with present casting methods is eliminated."

The steps in the process are these:

1. A model of the article to be cast is made of wood, metal or other suitable material.

2. This model is placed upon a base and a flexible mould-forming material such as rubber is built up around the model and vulcanized. The mould is then separated into half sections.

3. After removing the model from the mould, the two half sections are brought together again and a suitable quantity of a very low temperature fusing material which may be wax or a metallic alloy such as Wood's metal, is poured into the gate of the mould and the mould is rotated rapidly in a centrifugal casting machine. The wax is thus forced into the cavity of the mould.

4. The wax pattern thus produced is removed from the mould by separating the half sections of the mould. It is then invested in plaster of paris which will form a suitable mould for the metal which it is ultimately desired to form to that shape.

5. The investing material may be dried out in any suitable manner but in any event the mould created by the plaster of paris is subjected to sufficient heat to melt the wax and all traces of this wax are completely removed from the mould.

6. The cavity within the plaster mould conforms to the wax pattern. The mould (investment) is then placed in a centrifugal casting machine and the molten metal from which the casting is to be made is poured into this mould and is projected by the applied force of the centrifugal action into the fine recesses. The mould is then broken up and the metal replica of the original model is abstracted.

The process thus described is a refinement of the ancient "cire perdue" or the "lost wax" process. In brief it calls for two castings for the production of a metal replica of a model. First, a wax casting is produced which in turn is used to form a mould suitable for metal casting; second, a metal casting is formed with the aid of the final mould.

There is no dispute concerning the methods pursued by the defendants and intervenors in the manufacture of rings. All use the several steps of the process with the following variations: For the primary mould some use soft metal moulds as well as rubber moulds. To inject the wax into the primary mould all use a centrifuge and some also use an eye dropper or syringe, air gun, air injection machine, hydraulic machine and vacuum casting machine. All have produced and sold articles of jewelry made by the process. At least to the extent that defendants have used centrifugal force to deposit the wax into a primary rubber mould, and all have, there can be no question that they have infringed.[1]

The issue of validity is thus reached immediately.

At or about the time the plaintiff contrived his process, December, 1933, the jewelry manufacturing industry generally used one of four methods for the fabrication of rings.[2]

1. Handcraft by skilled artisans.

2. Cuttlefish casting, which consists of compressing the model of the ring to be reproduced between two loaves of cuttlefish bone. The yielding surfaces of the bone

---

[1] So much defendants concede. They deny, however, any infringement in the use of metal moulds and in the use of any means other than centrifugal force for the injection of the wax into the primary mould.

[2] The evidence was substantially all addressed to the formation of rings although the patent is not so limited.

form a cavity roughly corresponding to the form of the compressed model. A channel or opening between the two loaves permits the molten gold to flow into this cavity, to form a rough replica of the model. This casting is then hand-finished.

3. Sand casting, which consists of imbedding the model in a sand frame which, upon the removal of the model, leaves a cavity into which the molten metal· is admitted by an opening provided for the purpose. Its advantage over cuttlefish casting is that it permits the production of six to twelve castings from a single mould. The casting is rough and requires hand finishing.

4. Die stamping, which consists of stamping out the ring or parts of it by means of metal dies. This process is very efficient. It is still in extensive use when numerous castings of a single design are desired. Its initial cost is high. The dies for a single ring-design cost from $250 to $2,000.

Today cuttlefish casting and sand casting are of little commercial significance. Die stamping and the "lost wax" process are preeminent in the production of rings.

The evidence clearly supports a finding that, after Jungersen, the lost wax process as refined by him has been extensively employed in the manufacture of rings; and I shall therefore attribute to the patent "commercial success".

This, however, does not foreclose consideration of the issue of invention; nor does it render dispensible inspection of the prior art. Defendants rely upon seven items to prove that the patented process is old. In chronological order these are:

1. The Treatises of Benvenuto Cellini, 16th Century.

2. Haseltine, British Patent No. 2467, issued 1875.

3. Spencer, U. S. Patent No. 748,996, issued 1904.

4. Kralund, U. S. Patent No. 1,238,789, issued 1917.

5. La Gravure, Publication, 1926.

6. Slatis-Dee, use and sale of product, 1931.

7. Austenal, use, 1932.

Cellini describes in minute detail the "cire perdue" or lost wax process as applied to the casting in bronze of figures of life size or under. The features which distinguish it from the patented process are that Cellini does not use a rubber mould but one made of "Gesso", that is, plaster of paris or gypsum; he pours his wax, apparently employing no force but gravity to fill his mould; and when the wax is melted out, he allows the molten bronze to flow into its place, again without the use of pressure.

Plaintiff, of course, calls attention especially to Cellini's method of pouring the wax as differentiating it from the patented process. He also argues that Cellini's method was available only to the artist and not to the artisan because Cellini suggests that after the wax form has been prepared, "if you are minded to add any subtle labour or fancy to your work, you are easily able to do it". This last suggestion, however, does not diminish the value of the disclosure to those who are not minded to add "any subtle labour or· fancy". Finally, plaintiff argues that Cellini's publication is not part of the relevant prior art because it pertains to the non-analogous sculptural art. Consideration of this point is deferred since it is also addressed to some other prior art citations.

Haseltine's invention has as its object the production of a metal casting which is a perfect copy of its model. He teaches the making of a thin rubber mould about the model, into which mould, when freed from the model, he pours melted wax. To help the thin rubber retain its shape, he suggests its suspension in water. The wax model is invested with clay, after which the wax is melted out of the clay mould. He suggests that ordinary pouring of the metal into the clay mould will not give clear definition of lines and therefore recommends that the metal be poured through a pipe from a sufficient height so as to produce the required pressure. Illustratively he speaks of a statuette and in his drawing he shows a vase.

Spencer's patent is for a flexible mould for intricate designs. Neither with respect to wax nor metal does he teach the use of force or pressure for the injection into the mould.

It should be noted that of these references only Haseltine and Spencer were before the Patent Office.

Kralund is concerned with commercial castings, especially but not exclusively, of large bulk. He teaches the use of the "cire perdue" process with the addition of pressure derived from a die casting apparatus for the introduction of the wax into the die and for the introduction of the metal into the final mould.

His primary mould is of metal machined to its desired shape. Plaintiff distinguishes Kralund: the disclosure is in the field of commercial casting; Kralund's purpose was to preserve expensive steel dies by using them to cast wax patterns instead of stamping the finished metal product; if the jeweler had Kralund's dies he would stamp his rings, not cast them. While it is unquestionably true that Kralund was directing his efforts toward the more exacting requirements of precision tool casting, it does not follow that his disclosures can be dismissed as inapplicable. Clearly both plaintiff and defendant agree that by 1933 metal and rubber primary moulds were interchangeable and equivalent.

La Gravure adds little to the "cire perdue" process, except that it is explicitly applied to small pieces of jewelry. It does not teach the use of pressure in the wax casting stage but does suggest the use of steam pressure in the metal casting stage.

The Slatis-Dee method is identical with Jungersen's. However, defendants agree that it did not anticipate because it was secret. See, however, Dow Chemical Co. v. Halliburton Oil Well Cementing Co., 1945, 324 U.S. 320, 326, 65 S.Ct. 647, 89 L.Ed. 973. But defendants do rely upon a ring made by Slatis in 1931 and worn for some time by Radix, president of the Dee Company, as anticipating Claim 6. A customer of the Dee Company testified that he bought one cast ring which was not satisfactory. I am not inclined to give much weight to the Slatis-Dee use either as anticipation of the process or as anticipation of the product. The Barbed Wire Patent, 1892, 143 U.S. 275, 284, 12 S.Ct. 450, 36 L.Ed. 161.

Austenal: Great reliance is laid by defendants on the Austenal prior use. During 1932–1933, the Austenal Laboratories in Chicago developed a method of reproducing "Steele's Backings" for the dental trade. A Steele's backing is a small undercut metal rail which fits into a channel of an artificial tooth and is used to secure the tooth to the dental plate. The process employed was identical with Jungersen's except for the use of an eye-dropper to squirt the wax into the rubber mould in place of a centrifugal machine. For casting the metal Austenal employed a centrifugal machine or air pressure. I read the testimony on the Austenal use [3] to show the employment of an eye-dropper or syringe for the introduction of the wax but (though a syringe is capable of generating force) not for the purpose of applying force, and without the effect of pressure. The process met with only moderate success, was used for about a year and then superseded by a superior process.

Especially instructive is Jungersen's own testimony concerning his invention because it throws light on what he regarded as available art when he first undertook to make a casting of a ring. He testified that he had been a consulting engineer and manufacturer of gasoline and diesel engines and pumps. While sojourning in Canada, in 1933, he made a wager with a friend that he could take any job his friend would select out of the newspaper advertisements. He applied for employment with a jeweler who was looking for a caster in sand and offered to reproduce any model the jeweler assigned to him. He received a model of a ring. On his way home he bought some patching rubber at a gasoline station. At home he prepared a wooden frame in which he vulcanized a rubber mould about the model. "I had quite a little trouble with filling the mould with wax. I knew that the dentists were using wax patterns * * * and finally I fell on the idea of filling by centrifugal force * * *. I made a swing out of a wired clothes-hanger that I could swing around in my hand * * * and after that * * * I went to a mechanical dentist" where he made his final casting

---

[3] The record of another trial was received by stipulation.

by means of a centrifugal machine. Only later did he hear that he had done something unusual.

In his British application, filed September 1934, for "improvements in methods and means of casting metals" plaintiff stated, "In the casting of metal it is not broadly new to make an elastic mould from an original sample or model, to produce a wax or fusible pattern with the aid of the elastic mould and to remove the pattern from the latter and invest it in a final mould from which the wax or fusible pattern is subsequently melted out to permit the pouring of the metal into the mould cavity thus vacated."

Thus we have in substance the prior art available to Jungersen when he devised his process. The question is whether his teaching amounts to invention.

Before evaluating the advance made by him, note should be taken of three district court adjudications of the very patent in issue. The first is Jungersen v. Jenkins, D.C.Md.1939, 30 F.Supp. 615, 617. The case was "really undefended". The court emphasized the use of centrifugal force for the injection of both the wax and the metal, the view that the prior patents related to "non-analagous arts such as the sculptors' art and the dental and foundry arts", and commercial success. The court found all claims of the patent valid.

The second is Jungersen v. Morris Kaysen Co., D.C.E.D.Pa.1940, 31 F.Supp. 703. The court found all claims valid. It emphasized the novelty of the use of centrifugal or similar force for the introduction of the wax into the primary mould and the commercial success of the process. It relied on Bristol v. Otis Elevator Co., 3 Cir. 1931, 52 F.2d 772, 773, which held, "To anticipate a combination, the combination in its entirety must be old."

The last of the cases is Ostby & Barton Co. v. Jungersen, D.C.N.J.1946, 65 F.Supp. 652, 656. Plaintiff sought a declaratory judgment of invalidity and non-infringement. The court found that the patent described a combination of old elements to which a new one had been added, to wit, the use of centrifugal force for the injection of the wax into the primary mould. Relying upon Textile Machine Works v. Louis Hirsch Textile Machines, Inc., 1938, 302 U.S. 490, 497, 58 S.Ct. 291, 82 L.Ed. 382, it held that in order to validate the patent the addition must be the result of invention rather than the mere exercise of the skill of the calling. It found such invention. The prior knowledge, it said, was in the field of "non-analagous casting arts. The end results required in those arts were dissimilar to those in the jewelry art". It held that, if there were any doubt, it was dissipated by the commercial success of the process. The court found claims 1 to 4 valid. However, it found claims 5 and 6 invalid and cited the Kralund patent as an anticipation, although Kralund addressed himself to commercial castings. Claims 5 and 6 do not specify the use of centrifugal force. Claim 5 speaks only of introducing the wax into a primary mould by "force sufficient to deposit the material" and not injure the primary mould. Kralund, too, had taught making the wax pattern by "forcing molten material having a low fusing point into a metal mould or die under sufficient pressure to insure the filling of said mold or die".[4]

The novel feature of the Jungersen process relates to the casting of the primary pattern in wax or other fusible material. He injects the wax into the primary mould by centrifugal force. Does that constitute invention? Clearly the use of force for casting the metal is old; Haseltine, La Gravure, and Kralund taught it. The need of force for casting the wax was taught by Kralund who used a die casting machine. Moreover, by his claim of in-

4 In the Ostby & Barton case there was no claim and no finding of infringement of claims 1 to 4. Query whether weight is to be given to the finding of validity of these claims in view of Cover v. Schwartz, 2 Cir., 1942, 133 F.2d 541, 544, certiorari denied 319 U.S. 748, 63 S.Ct. 1158, 87 L.Ed. 1703, rehearing denied 319 U.S. 785, 63 S.Ct. 1325, 87 L.Ed. 1728; Addressograph-Multigraph Corp. v. Cooper, 2 Cir. 1946, 156 F.2d 483, 485; Brunswick-Balke-Collender Co. v. American Bowling & Billiard Corp., 2 Cir., 1945, 150 F.2d 69, 70, certiorari denied 326 U.S. 757, 66 S.Ct. 99; Sinclair & Carroll Co., Inc., v. Interchemical Corp., 1945, 325 U.S. 327, 330, 65 S.Ct. 1143, 89 L.Ed. 1644.

fringement plaintiff practically concedes the equivalence of the several modes for the application of force, namely, syringes, air pressure and centrifugal machines. The centrifugal casting machine was described in U. S. patent No. 1,457,040, issued to McManus in 1923, and was expressly stated to be suitable for the casting of jewelry such as rings "where molds may be used to be filled by centrifugal casting methods".

In brief, the lost wax process is very old.[5] The use of force, including centrifugal force, in filling the final mould is old. If the general casting art is the critical art for the patent in issue, I would have no hesitation in holding that the substitution of centrifugal force for other means of casting the wax is not invention, but the application of an equivalent means.

Once the use of force for the introduction of the wax into the mould was known to be desirable—and Kralund showed it—the choice of alternative means for the application of force became a non-inventive application of the skill of the caster's art. To put it simply, in the casting art it was old knowledge that the forced introduction of molten material into a mould produced greater definition of line and contour and greater fidelity of reproduction. McManus' patent showed the use of a centrifugal machine as the source of force for such purpose, which lent itself especially to small castings. Were it at that time desired to make faithful wax castings, as the final article of manufacture, it would not amount to invention to introduce the wax into the mould by centrifugal force. I fail to see why it rises to the level of invention when casting the wax pattern is an intermediate step in a longer process.

It is argued, however, that jewelry casting is non-analogous to the prior art. This argument cannot carry much weight. The art of photography has been held to be analogous to the art of blueprinting. Elliott & Co. v. Youngstown Car Mfg. Co., 3 Cir., 1910, 181 F. 345. Clay cutting has been held analogous to dough cutting. J. H. Day Co. v. Mountain City Mill Co., 6 Cir., 1920, 264 F. 963. The wood working art and metal working art have been held analogous. Ball & Roller Bearing Co. v. Sanford Mfg. Co., D.C.Conn.1922, 280 F. 415, reversed 2 Cir., 1924, 297 F. 163, but see page 165. See Walker on Patents, Deller's Ed. 1937, p. 226.

In the light of such precedents it is hard to justify a view that the casting of vases, statuettes, and small precision parts for tools is not analogous to the casting of rings. Perhaps such a view could be maintained if the casting art were transferred to a purpose never associated with a casting, such as, if rings had never been made by the casting process. But casting of rings by cuttlefish or sand mould is old art.

The evidence does not justify a finding that there is a distinct jeweler's art. The only substantial evidence on the subject was that the casting of jewelry was part of the casting art. A priori, I should suppose that when a jeweler engraves a ring, he employs the engraver's art, when he casts a ring, he employs the casting art. All that has been established is that jewelers did not use the "lost wax" method of casting. That tradition, habit and lack of economic pressure in the manufacture of a relatively costly article combine to close the eyes of a trade to available improvement does not elevate the adoption of the improvement to the rank of invention.

Moreover, it is clear beyond peradventure that Jungersen did not believe himself engaged in a non-analogous art. The opening paragraph of the patent, which has already been quoted, is quite instructive on that. Jungersen addresses himself to the casting

---

[5] A brochure published by Banco de la Republica, Bogota, Colombia, 1944, shows ancient gold statuettes, of native origin, attributed to the "lost wax" process.

Pál Kelemen, Medieval American Art (The MacMillan Co. New York, 1944), Vol. I, p. 241: "The cire perdue, or 'lost wax', process of casting was widely employed [by the Peruvian goldsmiths around the 10th century]. This method was essentially the same as that used for our bronzes today. It was known also in ancient Egypt and the Near East, then apparently lost to Europe in the first centuries of Christianity to be re-invented for the Renaissance shortly before Benvenuto Cellini. The perfection of this process in pre-Columbian America serves as a striking example of parallel development, when similar conditions produce similar results".

of small metal articles: "In carrying this invention into effect the designer of a piece of jewelry or any small article to be cast," also, the following, "It will be understood that this process is particularly applicable to the casting of precious metals, but it will also be understood that various other metals may be handled in the same way and particularly, base metals of tin and similar alloys."

The caption of the patent is "Method of casting articles of intricate design and a product thereof", clearly bringing it within the casting art. Cellini was undoubtedly a sculptor, but I doubt the jewelers would have regarded him as an intruder in their midst.[6]

The conclusion I reached is that the claims are all invalid because anticipated and for want of invention. Claim 6 is also invalid because it describes an old article in terms of a process of manufacture. Cochrane v. Badische Anilin & Soda Fabrik, 1884, 111 U.S. 293, 311, 4 S.Ct. 455, 28 L.Ed. 433; Pfanstiehl Chemical Co. v. American Platinum Works, 3 Cir. 1943, 135 F.2d 171, 173.

---

[6] Cellini's first apprenticeship was to a goldsmith. At Rome he was employed on jewelry. Is his celebrated salt-cellar in the sculptor's or the jeweler's art?