Per Ooriam : This case was referred to Trial Commissioner Donald E. Lane with directions to make findings of fact and recommendation for conclusions of law under the order of reference and Rule 57(a). The commissioner has done so in an opinion and report filed on April 15, 1968. Exceptions to the commissioner’s findings and report were made by all of the parties. The case has been submitted to the court on oral argument of counsel and the briefs of the parties. Since the court is in agreement with the opinion, findings and recommendation of the commissioner, with very slight modifications, it hereby adopts the same, as modified, as the basis for its judgment in this case as hereinafter set forth. Therefore, the court concludes as a matter of law that claims 1, 2, and 3 of U.S. Patent No. 3,096,224 are invalid and judgment is entered to that effect with plaintiff’s petition dismissed.
OPINION OE COMMISSIONER
Lane, Commissioner:
This is a patent suit under Title 28 U.S.C. § 1498, in which plaintiff seeks to recover reasonable and entire compensation for the alleged unauthorized use by defendant of a patented invention. Plaintiff alleges infringement of claims 1, 2, and 3 of U.S. Patent No. 3,096,224 entitled “Corrugated Paper Board Product,” which issued to plaintiff on July 2, 1963. Plaintiff is the owner of the ’224 *328 patent. The parties have agreed to defer accounting issues until the question of liability has been determined. Defendant asserts noninfringement, and intervenor asserts invalidity. Validity and infringement of the three asserted patent claims are the issues presented to the court for decision.
It is found that claims 1-3 of U.S. Patent No. 3,096,224 are invalid under the provisions of Title 35 U.S.C. § 102.
The invention claimed by the patent in suit relates to triple wall corrugated paper board including three corrugated sheets interposed between four spaced liner sheets. Triple wall corrugated paper board possesses desirable properties for packaging heavy objects and protecting frail objects in transit. It is rigid and strong, comparing favorably with wood as a packaging material for shipping objects too heavy to be shipped in prior corrugated paper board containers. Findings of fact 13-14 which accompany this opinion define the terminology used herein and briefly summarize the history of the corrugated paper board industry.
The three claims of the ’224 patent are product-by-process claims. They define a product by use of both structural description and a recitation of the method for making the product. Variations which exist in the language of the three patent claims are not important to the discussion of claim validity which follows: Claim 1, which is representative, is reproduced below with the method recitation set out as a separate paragraph:

Patent Claim 1

Triple wall corrugated paper board which is flat and adapted for scoring and bending to form a shipping container and consisting essentially of four paper liners, three _ corrugated paper mediums, the mediums being individually interposed between two liners in each instance, and adhesive applied to the ridges of the mediums’ corrugations and the liners and intimately and rigidly bonding the mediums and liners together, the corrugations of the mediums being parallel to each other throughout said board and high enough so that the total thickness of said board is at least % , and the total thickness of the liners and mediums being at least approximately .091", this total thickness being distributed *329 between the liners and mediums so that said board is strong and rigid,
said triple wall corrugated paper board having been made by a single pass of all or said sheets prior to setting of said adhesive simultaneously through a corrugated paper board machine having a heating and drying section operated at a temperature within the range of approximately 300° to approximately 350° F. and at a temperature-speed relationship which is varied with the humidity, the thickness, and porosity of said sheets to provide a residence time in said section sufficient to set said adhesive and make a rigid and strong triple wall corrugated paper board.
Claim 2 of the ’224 patent adds to claim 1 that the thickness of the board is at least i/2 inch and that the corrugations of at least one of the mediums are at least approximately .181 inch high. Claim 3 adds to claim 2 a recital that at least the liners on the outsides of the board are thicker than the thickest one of the mediums.
The best evidence introduced by the intervenor-defendant to invalidate the patent claims was evidence of a series of sales by plaintiff of a triple wall corrugated paper board produced by a manual process. Section 102(b) of title 35 U.S. Code provides that a person shall be entitled to a patent unless the invention was “in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States.”
Sale and public use of (triple wall corrugated paper board produced by plaintiff’s manual process occurred more than 1 year before October 2, 1953, which is assumed for the purposes of this case (to be the priority date for plaintiff’s application for a United States patent. Plaintiff does not controvert the evidence showing public use or sale of the manually produced triple wall board but contends that triple wall corrugated paper board as defined by the claims here in suit is patentably distinguishable from triple wall board produced by its manual process.
Plaintiff has attempted to distinguish the patented triple wall corrugated product and the product of its prior art manual procedure by asserting that the machine-made patented product has wood-like characteristics while the *330 manually laminated product has very few desirable qualities for a container. Such assertions are not supported by record evidence in this litigation. The evidence offered by the defendant-intervenor to show substantial identity of the product of the asserted patent claims and the manually produced item sold by plaintiff in 1952 is summarized below.
The product of the asserted patent claims is structurally indistinguishable from carefully manufactured triple wall board made according to plaintiff’s manual method. Any difference in strength which might exist between these two products results from the greater uniformity and efficiency which can he achieved by machine (double backer) manufacture. The actions of the plaintiff’s officers and agents during the period 1952-1953 show that the manually produced product was asserted to have the same desirable properties which plaintiff now uses as .a basis for arguing patentability of the wall board claim in the ’224 patent. It is concluded that the product defined in the asserted patent claims is not patentably distinguishable from the product of the prior manual process.
It is well established that a product claimed as made by a new process is not patentable unless the product itself is new. The Wood-Paper Patent, 90 U.S. (23 Wall.) 566, 596 (1814), Cochrane v. Badische Anilin & Soda Fabrik, 111 U.S. 293, 311 (1884). In the earlier case the plaintiff sued for infringement of a patent claim for paper pulp described as produced by a new process. The Supreme Court held the patent claim invalid because paper pulp was itself an old product, stating:
Paper-pulp obtained from various vegetable substances was in common use before the original patent was granted to Watt & Burgess, and whatever may be said of their process for obtaining it, the product was in no sense new. The reissued patent... is, therefore, void for want of novelty in the manufacture patented. 90 U.S. (23 Wall.), p.596.
More recent cases point out that the addition of a method step in a product claim, which product is not patentably distinguishable from the prior art, cannot impart patent-ability to the old product. Jungersen v. Baden, 69 F. Supp. *331 922, 928, 72 USPQ 426, 431 (D.C. S.D. N.Y. 1947), aff'd, 166 P. 2d 807 (2d Cir. 1948), aff'd, 335 U.S. 560 (1949); In re Stephens, 345 F. 2d 1020, 1023, 145 USPQ 656, 658 (CCPA 1965).
The parties have requested findings which bear on the issue of the obviousness of the method of manufacturing the product of the asserted patent claims. Because of the legal principles expressed above, obviousness of the method is not a question for decision in this litigation. The accompanying findings of fact, although they may be indirectly relevant to patentability of the method, have been drafted to resolve questions of validity of the asserted product claims.
It should be noted that Section 102(b) is literally applicable only if the public use or sale is of the invention on which a patent application is later filed. However, complete identity of (1) a product sold or publicly used and (2) a product as claimed in an application filed more than 1 year after the sale or public use, is not a prerequisite for invalidation of the patent on the basis of the prior sale or use. Connecticut Valley Enterprises, Inc. v. United States, 172 Ct. Cl. 468, 474, 348 F. 2d 949, 953, 146 USPQ 404, 407 (1965); Dix-Seal Corp. v. Nero Haven Trap Rock Co., 236 F. Supp. 914, 917-920, 144 USPQ 57, 61-63 (D.C. Conn. 1964). As the findings of fact show, the prior art product and the claimed product are structurally identical and possess substantially identical physical properties. Section 102 (b) is applicable in this case.
In view of the invalidity of 'all the asserted patent claims, it is not necessary to consider the numerous alternative invalidity defenses raised by the intervenor-deiendant, or the issue of infringement. See Martin-Marietta Corporation v. United States, 179 Ct. Cl. 70, 373 F. 2d 972, 153 USPQ 206 (1967). Plaintiff’s petition should be dismissed.
Findings of Fact
1. Plaintiff seeks recovery of reasonable and entire compensation under 28 U.S.C. § 1498 for the unauthorized use and manufacture by or for the United States of a patented invention relating to corrugated paper board products. The claim herein is based upon the alleged infringement of United *332 States Letters Patent No. 3,096,224 granted in tlie names of Samuel Goldstein and Immanuel Lichtenstein on July 2, 1963, for “Corrugated Paper Board Product.” The ’224 patent in suit was issued to and is owned by Tri-Wall Containers, Inc., a corporation organized under the laws of the State of New York, as assignee of the inventors.
2. Intervenor-defendant St. Regis Paper Company voluntarily intervened in this case asserting pecuniary interest in that St. Regis had indemnified the defendant United States against certain infringement claims.
3. The parties agreed that the issues of validity and infringement of the ’224 patent first be determined upon proofs, arguments, findings of fact, and conclusions of law, and that accounting issues be deferred until after the entry of judgment or liability by the court.
4. No action has been taken on plaintiff’s claim by the Congress or any department of the Government in any judicial proceeding including any in the Tax Court.
5. On July 15,1963, the General Services Administration was notified that its procurement of certain corrugated paper board products was an alleged infringement of United States Letters Patent No. 3,096,224.
6. The petition as originally filed by plaintiff also alleged that procurement by the United States was infringement of two additional patents owned by the plaintiff, namely, United States Patent No. 2,969,170, issued on January 24,1961, and United States Patent No. 2,985,553, issued on May 23,1961. Plaintiff, under the provisions of Rule 67 (a) (2), dismissed the allegations of patent infringement as to patents 2,969,170 and 2,985,553.
7. The patent in suit, United States Letters Patent No. 3,096,224 dated July 2, 1963, issued upon application Serial Number 150,618, filed November 3,1961, as a continuation of application Serial Number 604,429, filed August 16, 1956, which in turn was a division of application Serial Number 383,756, filed October 2, 1953. Application Serial Nuinber 604,429 was not directed solely to subject matter described and claimed in the original application Serial Number 383,756 as filed, and was not exempt from statutory requirements *333 for execution. Application Serial Number 604,429 recites that the application was signed, executed, and sworn to by the joint applicants Goldstein and Lichtenstein before a New York notary public at New York, New York, on August 14, 1956. At the trial, applicant Lichtenstein admitted on cross-examination that he was in Connersville, Indiana, during the entire week from Monday, August 13, until Friday, August 17,1956; that in fact he did not appear before the notary public in New York and take the oath which the application recites that he took on August 14,1956; that he does not have a completely clear recollection of the circumstances surrounding the execution of application 604,429; and that he regards the making of an unsworn statement as being equivalent to taking an oath to the same effect. The conduct of Lichtenstein in signing said application is found to be without fraudulent intent.
8. It is found that the invention claimed in the ’224 patent in suit was sufficiently described in applicants’ prior abandoned application to comply with Title 35 U.S.C. § 112. One variance exists between abandoned application 604,429 when compared with the fundamentally similar specifications of earlier filed patent 2,759,523. The abandoned application 604,429 refers to a temperature of 330° F. whereas the other specifications recited 350° F. This appears to be the result of a typographical error. The teaching relating to a speed-temperature correlation which is expressed in all three patent specifications is adequate to enable a person skilled in the art to practice the invention.
9. Product claims were not present in original patent application 383,756, filed October 2,1953. They were first inserted by amendment dated November 4, 1954. After a restriction requirement made by the Patent Office, the product claims were withdrawn from the original application. The second patent application 604,429, filed on August 16, 1956 (the abandoned application), and the third application 150,618, filed on November 3, 1961 (the application which matured into the ’224 patent in suit), both contained only product claims. During the prosecution of product claims in the three applications, the claim recitals were varied. The prod *334 uct claims of all three patent applications recited the same basic structure of three corrugated sheets interposed between four liner sheets. The ’224 patent in suit is assumed for the purposes of this case to be entitled to a priority date as of October 2, 1953, the filing date of the original application 383,756.
10. The ’224 patent in suit discloses a corrugated paper board product which is rigid and strong, which compares favorably with wood as a packaging medium, and which has a cushioning effect on products contained therein which is not exhibited by packages or crates constructed of wood. The patented paper board includes three corrugated sheets interposed and sandwiched between four spaced liner sheets, formed by simultaneously setting the adhesive during a single pass of all of said sheets through a heating and drying section of a machine. While prior triple ply corrugated paper board in which three corrugated sheets had been interposed between four spaced liner sheets had been produced, such a product had not been produced by a machine in the manner recited in the ’224 patent claims.
11. The product claimed in the ’224 patent may be described by the manner in which it is produced. Three sheets of paper are corrugated and the ridges of the corrugations are ad-hesively secured to liner sheets forming three composite sheets of single face corrugated paper board. The three sheets of single face corrugated board are brought into juxtaposition at one end of a corrugated paper board machine and passed over hot preheater drums. An outer liner or fourth liner is also run over a hot preheater drum at approximately the same time. The three sheets of single face corrugated paper board and the liner sheet are all preheated, and the single face sheets are then run over gluing rolls where glue is applied to the ridges of the corrugations which extend transversely to the direction of travel of the paper webs, and the four juxtaposed paper webs are brought into a machine known as a double backer in order to set the glue just applied. At the time that the juxtaposed paper webs go into the double backer the sheets are relatively heavily laden with moisture. Enough heat is applied in the double backer not only to set the glue but also to dry the paper to at least some extent. The inventors *335 found that the optimum conditions for accomplishing the proper setting of the glue, and therefore bonding of the four juxtapositioned paper webs is to run the webs through the double backer at between 135 and 150 feet per minute with the temperature of the hot plates of the double backer maintained between 325° and 330° F. An exact speed-temperature relationship cannot be set forth due to variables encountered such as humidity, thickness of paper, porosity, and other factors. The ’224 patent specification discloses speed and temperature ranges which encompass 100 to 175 feet per minute and 300° to 350° F.
12. The three claims of the ’224 patent are product claims. They recite structural limitations and also recite the method for making the product. Claim 1, reproduced in the body of the opinion, is representative of all three claims in issue which differ only in reciting different dimensions for corrugated and liner sheets, as noted in the opinion.
13. The history of the corrugated paper board industry involves numerous product improvements. Unlined corrugated material was known as early as 1870. Corrugated sheets have been used as cushioning but since they had no structural strength they could not be used as a carton. Increased strength has been a goal of the industry in its attempts to supplant wood as a material for the construction for shipping containers. The strength of corrugated paper products was at an early date slightly improved by gluing a liner, a flat sheet of paper, to a corrugated medium to produce a single face corrugated sheet. Single wall board, sometimes referred to as double face, followed. Single wall board includes a corrugated medium placed between two liner sheets. Single wall resulted in a paper board with enough structural strength to be used in the manufacture of cartons. In approximately 1920 the corrugated paper board container industry began to make a board which was designated as double wall board. Double wall board consists of two corrugated mediums interposed between three liner sheets. The advantages of double wall board over single wall (double face) board were that double wall board enabled a shipper to increase the weight of the contents in a shipment and that it provided a material with a greater cushioning effect. In the early 1950’s plain *336 tiff’s predecessor developed and introduced triple wall corrugated paper board. This product was a corrugated paper board which embodied three corrugated mediums interposed between four spaced liner sheets.
14. The history of development work on triple wall board .by plaintiff is important in relation to validity of the patent in suit. In 1947 plaintiff became an exclusive licensee for the United States east of the Mississippi under patents involving a product known as Lammite. Laminite was a channel-shaped, triple wall, corrugated paper product impregnated with sulfur to increase the strength of the product. This product was originally made by gluing together three sheets of previously formed single face board and one liner sheet on a machine and then immersing the product in molten sulfur. Difficulties were encountered with the initial channel-forming machine for making La/rmnite. Plaintiff consulted numerous experts to determine the best method of overcoming the forming machine difficulties. At the time that the experts were considering possible solutions to the machine problems, there was also running at the plant a corrugating machine consisting of two single facers and a double backer. The channel-forming machine and the corrugating machine were parallel to each other, separated by a distance of a few feet. The channel-forming machine which made Lammite did not obtain proper adhesion or lamination between the various components of the triple ply product. When the mandrels of the Lammite machine were not exactly aligned, the resulting product had. kinks caused by slippage of the various plies of the triple ply product. A new machine was built to produce the triple ply product which was to be impregnated with sulfur. The new machine did not perform in the manner expected and produced only waste. Plaintiff was in the position where it could not fill the orders of its customers for Lammite.
15. A manual method for the manufacture of Lammite was developed. The method consisted of making a double wall sheet of corrugated paper board upon machinery, i.e., with two single facers and a double backer. The double wall board was then out to suitable lengths and placed on a table Where a cut length of single face was passed over a suitable *337 adhesive roll by several operators who manually placed the single face over the double wall board in order to adhere the single face to the double wall. The manufacture of triple wall by this manual method is shown in intervenor-defendant’s exhibit 8. The double wall board had previously been appropriately scored so that after the single wall had been set in place the triple ply board could be placed upon a suitable jig and folded into a channel shape. The channel shape was then dipped into a molten sulfur bath. Triple wall corrugated board produced by plaintiff’s above-described method was also sold in the plain, unimpregnated state, shipped in the form of flat, scored, and slotted sheets for making shipping containers such as fivefold cartons and regular slotted cartons and covers for Laminite channels. Starting at least as early as May 16, 1952, plaintiff sold its unimpregnated triple wall corrugated paper board products under the trademark “Tri-Wall Pak.”
16. Contemporaneous sales correspondence and documents produced by plaintiff from its files and in evidence in inter-venor-defendant’s exhibit 9A in this case reflect the following sales of unimpregnated triple wall corrugated paper board products produced by plaintiff’s manual method more than 1 year prior to October 2, 1953, the priority date of the ’224 patent claims.
Product Customer Date IDX-9A
Scored covers...Kaiser Al. & Chem. Corp. 7/18/51 L-10
17. With respect to the quality and attributes of the un-impregnated triple wall corrugated paper board made by its prior manual method, plaintiff made the following contemporaneous claims and representations to its customers and potential customers:
Containers..Bigelow-Sanford Carpet Co. 3/18/52 L-40
Containers..Magee Carpet Co.. 7/24/52 L-62
Containers. ..Metal Trims Inc.. 9/8/52 L-73
Containers_TJ.S. Rubber Co_ 9/25/52 L-84
Containers..Columbia Steel & Shafting Co. 9/29/52 L-85
(a) To Aluminum Company of America, on September 11,1951: A possible substitute “for your present %" lumber containers.”
*338 (b) To Kirsch. Company, on January 3, 1952: This “container is decidedly competitive with the wood box, both performancewise and costwise. In fact, we are now supplying Lorentzen Hardware with this type box for their export shipments.”
(c) To Kaiser Aluminum & Chemical Corp., on February 28, 1952: “[W]e understand that you are contemplating continuing the use of Laminite for certain sizes, and possibly substituting the five fold container for your present wood boxes. With this in mind, we would like to ship you a representative quantity of the five fold sheets in a size that would be best adapted for your test shipments. * * * Incidentally, the puncture test on our triple wall sheet is over 20% better than that for Alcoa’s sheet.”
(d) To Engineer Research & Development Labs, on April 21,1952: “We shipped the ten pieces of triple wall on April 17th, * * *. Walter Armstrong, while at Atlantic City, thought there might be a use for our triple wall sheets as a substitute for plywood in the packing of army maps. We hope so!”
(e) To Quartermaster Food & Container Institute, on July 8,1952: “Triple wall may be obtained in plain sheet form or in special design, slotted and scored sheet which forms a container up to twenty-four inches in cross section and in lengths up to twenty feet.”
(f) To Columbia Steel & Shafting Co., on September 3, 1952: “Our Tri-Wall Pak tests approximately 800#.”
(g) To Reynolds Metals Company, on September 19, 1952: “At present this particular type of container [Tri-Wall] is being used not only where a great deal of cushioning is required but also as a substitute for wood boxes in export as well as domestic shipments. Our puncture test of ‘Tri-Wall Pack’ is in the neighborhood of 800 lbs.”
18. Other documents from plaintiff’s files and in evidence, in addition to those identified above, establish the commercial use of unimpregnated triple wall corrugated board containers produced by plaintiff’s manual method more than a year prior to October 2,1953.
(a) In November 1951, in connection with a price quote on unimpregnated fivefold triple wall boxes submitted to Pittsburgh Plate Glass Co., plaintiff wrote:
*339 We are enclosing several pictures taken at Michigan Seamless Tubing plant showing our Triple Wall boxes in use. These particular boxes are 6" X 8" — 24'4" and, as you see, they are taking a considerable amount of abuse.
(b) In January 1952, plaintiff wrote to Appleton Wire Works, Inc.:
In addition to our Laminite line, we have developed something that no other corrugated manufacturer has attempted, namely, a Triple Wall, Five Fold, Scored Corrugated Sheet, which may be made up into containers measuring up to 14" and in length up to and including 25'. This product has been very popular as a substitute for the wooden box where the item is not too flexible, particularly in the long lengths.
(c) In January 1952, plaintiff also wrote to The Norton Company:
[W]e are manufacturing a Triple Wall, Five Fold, Scored Corrugated Sheet in sizes to make up containers measuring 14" and up to 25' in length. This triple wall flat sheet is considerably stronger than the present double wall sheet now used in industry, and compares favorably in end use with a wood box, particularly in the shorter lengths. Naturally, the cost is considerably less than wood.
(d) In March 1952, in an interoffice memo, plaintiff’s sales manager wrote:
Kindly ship to me at once * * * triple wall five fold sheet. * * * [C]ustomer (Michigan Seamless 'Tube Co.) is ready to reorder C.L. and wants to decide whether or not to have slotted ends. [“C.L.” in this memo means freight car load.]
(e) In September 1952, plaintiff wrote to Columbia Steel & Shafting Co.:
Tri-Wall Pak is now being supplied to Michigan Seamless Tube Co., * * *; Van Huffel Tube Co., * * *; Trent Tube Co., * * *; and to many manufacturers of metal extrusions.
19. The commercial success and sales of plaintiff’s triple wall corrugated board products produced by the manual *340 method, coupled with a desire to reduce production costs and increase production rates, prompted the patentees to develop a machine method of making the triple wall board product. The all-maohine laminated triple wall board was marketed for the first time in 1953. For a short time thereafter plaintiff sold both machine-made and manually produced triple wall board under the same trademark, “Tri-Wall Pak.”
20. Any degree of difference in quality between the triple wall corrugated board in which all three single face components and the bottom liner are machine-laminated by means of a conventional double backer and the triple wall board of the same constituents in which only two of the three single face components and the bottom liner are machine-laminated by means of a conventional double backer, and the third single face component is then hand-laminated to the resulting composite structure, results from a greater degree of uniformity of bonding of the third single face component to the remaining structure which can be achieved by the double backer. It is possible to achieve good bonding by either method.
21. As between two specimens of triple wall board made of the same components, one made by the manual method, and the other made by the all-machine method, the glue bonds in each specimen being well made in accordance with their respective manufacturing methods, there is no significant difference in the quality of the boards or in their suitability for use in shipping containers. The test results of record in this case show a substantial identity of physical properties.
22. The product defined in the ’224 patent claims is found to be anticipated by the product produced by plaintiff under its prior manual method. The patented product is found to possess the identical structure and indistinguishable physical properties when compared to the prior art product of plaintiff.
23. The patent application files of the three relevant applications show that the Patent Office was not apprised of the extent or timing of the public sales of triple wall corrugated board made by plaintiff’s prior manual method; There is no indication that the Patent Office was aware of the complete *341 facts regarding such prior use and sale when it allowed and issued the claims of the ’224 patent.
24. Intervenor-defendant has asserted that the ’224 patent is invalid for the reason that there had been produced by Syracuse Containers, a division of Eobert Gair Company, Inc., a product which was substantially identical to the product disclosed and claimed. During the period 1935-1940, the Syracuse Containers plant produced and sold a specialized item in the form of an insulating board, for certain items such as ice cream containers, composed of three liners and three corrugated mediums. The insulating board made at Syracuse Containers including only three liners is structurally distinguishable from the plaintiff’s claimed product. There has been no showing that the Syracuse board possesses strength comparable to plaintiff’s claimed triple wall board. The product made at Syracuse does not anticipate the ’224 patent claims.
25. The invention claimed is set forth in the three product-by-process claims which vary only in calling for different thicknesses of paper board and height of the fluted components. All three patent claims recite a triple wall corrugated paper board product made by a method defined as follows:
* * * said triple wall corrugated paper board having been made by a single pass of all of said sheets prior to setting of said adhesive simultaneously through a corrugated paper board machine having a heating and drying section operated at a temperature within the range of approximately 300° to approximately 350° F. and at a temperature-speed relationship which is varied with the humidity, the thickness, and porosity of said sheets to provide a residence time in said section sufficient to set said adhesive and make a rigid and strong triple wall corrugated paperboard.
26. The intervenor-defendant and plaintiff with no objection from the defendant United States have stipulated that the St. Eegis Paper Company, since July 2, 1963, manufactured and sold to the United States triple wall corrugated paper board which was flat and adapted for scoring and bending to form shipping containers and which consisted essentially of four paper liners and three corrugated paper *342 mediums, the mediums being individually interposed between two liners in each instance, and having adhesive applied to the ridges of the corrugations and the liners for intimately and rigidly bonding the mediums and liners together, the corrugations of the mediums being parallel to each other throughout said board and high enough so that the total thickness of said board was at least and the total thickness of the liners and mediums was at least approximately .091". The St. Regis Paper Company on September 24,1964, and on May 6,1966, used temperatures ranging between 300° and 350° F. as the operating temperature in its double backer for fabricating the triple wall corrugated paper board. The speeds of the double backer corresponding to these temperatures were of the order of 100 to 170 feet per minute with an average speed of 140 to 160 feet per minute. The product manufactured at these temperatures and speeds was a rigid, firm, and well-bonded triple wall corrugated paper board, a flat sheet adapted for scoring. The inner liners of the product produced were 42-pound liners, and the outer liners were 90-pound liners. The mediums were standard mediums.
Conclusion of Law
Upon the foregoing findings of fact which are made a part of the judgment herein, the court concludes as a matter of law that claims 1,2, and 3 of U.S. Patent No. 3,096,224 are invalid. Judgment is entered to that effect, and plaintiff’s petition is dismissed.