**TRI-WALL CONTAINERS, INC.,**
**Plaintiff,**

v.

**CONTINENTAL CAN CO., Inc.,**
**Defendant.**

**No. 64 Civ. 217.**

United States District Court,
S. D. New York.

Feb. 4, 1971.

Richard A. Huettner, New York City, for plaintiff; Charles B. Spencer, John P. Kirby, Jr., Kenyon & Kenyon, Reilly, Carr & Chapin, New York City, of counsel.

Brumbaugh, Graves, Donohue & Raymond, New York City, for defendant; Granville M. Brumbaugh, James N. Buckner, Thomas D. MacBlain, New York City, of counsel.

## OPINION

COOPER, District Judge.

Plaintiff, Tri-Wall Containers, Inc. (hereinafter "Tri-Wall"), a New York Corporation, is engaged in the manufacture and distribution of corrugated paper board containers. Tri-Wall's prominent product, triple wall board, is described and produced in accordance with the teachings of United States Letters Patent No. 3,096,224.[1] Tri-Wall[2] alleges literal infringement of this patent by defendant Continental Can Company, Inc., (hereinafter "Continental"), a New York Corporation.

---

1. The tortuous background of the patent in suit is as follows: Samuel Goldstein and Immanual Lichtenstein secured a method patent, originally filed October 2, 1953 "for [the] making and scoring [of] triple wall corrugated paper board" on August 21, 1956. D.Ex. AF, col. 1, lines 1-2. ("P.Ex." or "D.Ex." respectively refer to plaintiff's or defendant's exhibits introduced into evidence at trial) A divisional product application S.N. 604,429, filed August 16, 1956, was re-

jected by the Patent Office examiner, D. Ex. AH, p. 105-7, 191-3, 221-3, affirmed by the Board of Appeals, March 8, 1960. D.Ex. AH, p. 284-5. The co-inventors then instituted an action pursuant to 35 U.S.C. § 145, for judicial review of the Board's determination. During the pendency of this litigation, they filed a continuation application of the divisional application, S.N. 150,618 (November 3,

Jurisdiction and venue are conferred under the patent laws of the United States, 35 U.S.C. and 28 U.S.C. §§ 1338, 1400. This opinion constitutes our findings of fact and conclusions of law in accordance with Rule 52, F.R.Civ.P.

### The Patent In Suit

Although the patent is comprised of three claims, each and every requisite of the alleged invention is disclosed in claim 1.[3] Thus:

"1. Triple wall corrugated paper board which is flat and adapted for scoring and bending to form a shipping container and consisting essentially of four paper liners, three corrugated paper mediums, the mediums being individually interposed between two liners in each instance, and adhesive applied to the ridges of the medium's corrugations and the liners and intimately and rigidly bonding the mediums and liners together, the corrugations of the mediums' being parallel to each other throughout said board and high enough so that the total thickness of said board is at least ⅜″, and the total thickness of the liners and mediums being at least approximately .091″, this total thickness being distributed between the liners and mediums so that said board is strong and rigid, said triple wall corrugated paper board having been made by a single pass of all of said sheets prior to setting of said adhesive simultaneously through a corrugated paper board machine having a heating and drying section operated at a temperature within the range of approximately 300° to approximately 350° F. and at a temperature-speed relationship which so varied with the humidity, the thickness, and porosity of said sheets to provide a residence time in said section sufficient to set adhesive and make a rigid and strong triple wall corrugated board." P.Ex. 1, p. 6, col. 5 line 45—col. 6 line 2.

In essence, the "product-by-method" envisioned by Tri-Wall is the combination of three corrugated mediums interposed between four paper liners by a distinctive method of manufacture to produce an extraordinary stiff "woodlike" triple wall paper board. The significant attribute of plaintiff's corrugated paper board, the beam strength, enables it to be used as a substitute for wood to form a shipping container. The characteristics of the corrugated paper box: relative light weight, facility in storage or disposal, ease of handling without employing a large crew of carpenters, combine to make plaintiff's product far more preferable to the wood container.

### The background of the product

The genesis of Tri-Wall's product was the purchase by the Goldstein brothers in 1947 of machinery from the Old King Cole Company, (Tr. 37)[4] coupled with an exclusive license to manufacture the products it produced. (Tr. 36)[5] In their initial manufacturing process, the brothers first purchased single face corrugated board.[6] Single face board is formed by the combination of a liner pa-

---

1961), which eventuated in the patent in suit. Subsequent to the filing of this application, the § 145 suit was voluntarily dismissed.

2. The patent in suit was issued to plaintiff as assignee of inventors Goldstein and Lichtenstein.

3. Claims 2 and 3 do not differ significantly from the elements set forth in claim 1. Claim 2 provides that the total thickness of the board be at least one-half inch and the corrugations of at least one of the mediums be at least 181 inches high.

Claim 3 simply adds that the outside liners of the board be "thicker than the thickest one of the mediums."

4. "Tr." followed by a page number refers to the trial transcript.

5. This machinery, discovered by the brothers in Canton Ohio, was transported to their plant in Wassaic, New York.

6. In 1949 they acquired a conventional single face corrugating machine and produced their own single face board. (Tr. 49)

per (P.Ex. 2) [7] and a corrugated medium (P.Ex. 3) [8] and the application of an adhesive to the tips of the medium's flutes. They then introduced three rolls of single face sheet and a bottom liner into the King Cole machine, coating the exposed tips of each of the single face board's corrugated mediums with a sodium silicate adhesive. (Tr. 38–41, 143) The combined plys were brought flat and fed into channel-shaped dies [9] (Tr. 144), forming triple wall channel board. The combined board, as it exited from the channelizer, was cut to the appropriate length (Tr. 40) and "sent" into a frame or jig that conveyed the board into a bath of molten sulfur.[10] (Tr. 144) Upon emerging therefrom, the three-wall board solidified when exposed to air, and the finished product's, Laminate's, rough edges were trimmed. (Tr. 144) Plaintiff's witnesses testified that the pre-immersed board felt "soft" and "squashy" (Tr. 145), "dampish" (Tr. 309), "more like padding material." (Tr. 41) They unanimously attributed Laminate's beam strength,[11] rigidity, to the sulfur treatment. (e.g. Tr. 33, 143)

The brothers encountered a plethora of substantial difficulties with this method of producing triple wall corrugated paper board: the channels were often formed with weak points in the legs; lamination was not always successful and necessitated hand application of an adhesive and clamping of the board until the bond secured (Tr. 146–7); the physical operation was nothing less than gigantic;[12] a change in the size of the desired board container required a day long operation to replace the "countless numbers" of dies;[13] a pungent sulfur dioxide odor (Tr. 65, 67); and "the quality [of the completed board] was so bad." (Tr. 47) Laminate, plaintiff's first venture in the sale of triple wall board, 1947–1950, met with little commercial success. (Tr. 61)

Undaunted, the brothers sought guidance from "outside" consultants and settled upon "a chap by the name Deering Roberts"[14] to design a more successful mechanical operation. Roberts devised a method of manufacture which incorporated the sulfur impregnation principle of Old King Cole,[15] but replaced the met-

7. Liner paper is a flat, brown-colored, kraft sheet of paper.

8. Corrugated medium, semi-chem, is a fluted sheet of paper, equally curved ridges and hollows. Single wall is simply the addition of a second sheet of liner to single face. Double wall, accordingly, is composed of two mediums interposed between three paper liners. Triple wall is the addition of a third medium and a fourth liner.

9. The channelizer machine contained a series of dies, a bottom square shaped die which held the material and a top "U" shaped die which exerted pressure on the triple wall board to unite the three faces and shape the board. (Tr. 41)

10. The combined board was immediately dipped into the sulfur. The procedure did not provide the sodium silicate adhesive an opportunity either to set or apply heat to dry the board. The only aid to achieve a satisfactory bond at this point of the operation was the pressure exerted by the interlocking dies.

11. Beam strength was defined by witness Goldstein as "the ability to handle structural loads." (Tr. 43)

12. The sulfur bath was more aptly described as a "swimming pool filled with about seventy tons of sulfur." (Tr. 49)

13. This chore was described by witness Goldstein as a "herculean job and if you did not align them [dies] correctly you would get board that was twisted and warped." (Tr. 47)

14. Witness Goldstein described Roberts as "one of the top engineering men in the country" who "had done some very excellent work" for another paper concern. (Tr. 48)

15. At the time of the Roberts' scheme, the machinery in the Wassaic plant included three single facers, a bridge, a double backer, a duplex scorer and an automatic cutoff knife, (Tr. 150)—the equipment ultimately to be used by plaintiff in producing its patented triple wall board. Tri-Wall contends that despite the proximity of this machinery to the channelizer, not one of the "experts," especially Roberts, conceived of combining the three sheets of single face on the corrugation line. However, witness Goldstein, in de-

al dies of the channelizer with movable belts supported by rollers. (Tr. 148) Installation of the Roberts machine was abruptly accomplished on a Saturday (early 1950) when two welders appeared, "tore" the old equipment apart, and "threw the pieces [presumably no longer needed] out in the yard." (Tr. 49) In short, Old King Cole was "scrapped" (Tr. 149), all hopes were focused on the new production line. The "success" of the Roberts machine was succinctly summed up by witness Goldstein, "It was disasterous * * * It didn't work." (Tr. 50, 154) The machine failed to achieve a satisfactory lamination of the single face sheets (Tr. 50–1, 158–60) to even warrant immersing the "combined" board into the sulfur bath.

The resourceful brothers, hovering on the brink of business ruin[16] and apparently without any machinery to combine three sheets of single face for sulfur immersion, abandoned the Roberts scheme and devised yet another method of manufacture. They first produced double wall corrugated paper board on a standard corrugation line. This operation consisted of two single facers[17] producing continuous sheets of single face board; application of glue to the single faces' exposed flute tips; introduction of a bottom or third liner which entered, simultaneously with the two single face sheets, a double backer[18] that combined the three material layers. Contemporaneously, an additional roll of single face was produced on a single facer. This single face board was then passed over a glue applicator[19] that coated the exposed tips of the sheets' flutes, and carefully placed by hand on top of the double wall board. The resulting triple wall board was scored and folded to form a "U" shaped channel, and carried by conveyer into the sulfur bath. (Tr. 52–4, 160–4, D.Ex.AE) Witness Lichtenstein testified that the pre-immersed board, similar to earlier methods of production, was "soft, squashy * * * pad-like" (Tr. 164) and that it was only subsequent to the sulfur treatment that the board had the essential beam strength to enable it to form a shipping container. (Tr. 165) Although this method produced commercially satisfactory laminat-

tailing the task Roberts had been hired to perform said:

"Q The new equipment was to do what, Mr. Goldstein?

A Do exactly the same task but better that [sic] was being done by the equipment as shown in 8 [channelizer].

Q What was the end product supposed to be like that you asked Mr. Roberts to build a new machine for?

A We asked Mr. Roberts to build a sheet of the same quality, the same material, using the same single face corrugated and the same medium which would be laminated properly, which would have strength so we could at least support it before it entered the sulfur tank and to do it at low cost." Tr. 48–9.

16. They were faced with the imminent loss of their last large customer expecting weekly delivery. (Tr. 51)

17. A single facer, in general, operates on the following principle: the first of two rollstands releases a web that is carried around a pre-conditioner drum which both heats and moistens the sheet; it is next passed between two corrugating rolls which by the application of steam corrugates, or flutes, the web; adhesive is applied to a side of the corrugation and the medium is then pressed together with the flat liner sheet of the second rollstand; the instantaneous setting of the adhesive securely bonds the single face as it exits from the nib of the single facer. (Tr. 468–70)

18. In the double backer, the two sheets of single face are carried along a belt structure which sandwiches the webs as they pass over a series of steam heated plates (about 40–44 feet in length) and the adhesive begins to set. The combined board then travels through the cooling section where pressure is continued until the bond is secure. As it exits from the double backer the double wall board is slit and scored to the appropriate size and shape. (Tr. 470–5)

19. Initially, the brothers dipped a brush into a bucket of adhesive and "shmeared it on the sheet [of single face]." (Tr. 52) Then they refined the procedure to use the more sophisticated glue roll. (Tr. 162)

ed three ply board, it continued to suffer (as previously described) from the shortcomings inherent in the use of sulfur immersion. Additionally, the various manual operations involved in the combining of the board prior to sulfur impregnation substantially increased labor costs.[20] (Tr. 168) Despite these difficulties, the brothers persisted in pursuing this method of manufacture for some two and a half years. (Tr. 166–9)

Sam Goldstein, in late 1952, seeking to avoid the expensive labor costs involved in their most recent production method, conceived the idea of eliminating the manual combination of the single face sheet to the double wall by modifying their corrugation line to unite all seven layers mechanically. Accordingly, a third single facer was added to the line, and the machinery altered [21] so that the three sheets of single face, rather than two, were simultaneously introduced into the double backer and securely bonded. (Tr. 170–2) To their amazement and delight, not only was the lamination successful, but the combined triple wall board, as it exited from the double backer, was "stiff, hard to the touch and wood-like," (Tr. 173) obviating the need for sulfur immersion.[22]

### Production of triple wall board

The method of manufacture generally used by the producers of triple wall corrugated board is as follows. The corrugation line begins with three single facers. In each single facer a roll of flat corrugating medium (web) is heated and moistened, passed between corrugation rolls forming corrugations, coated with a sodium silicate adhesive [23] on one side of the tips of the now fluted medium, and joined with a roll of flat liner paper. The three single facers are identical except for a variation in the corrugating rolls to produce different size flutes.

As the three sheets of single face exit the single facers, they then follow an identical path: each is led over guide devices which align the sheets, heated by a pre-heater drum, passed through adhesive applicator rolls coating the exposed tips of the medium's flutes, and introduced simultaneously, with a bottom liner, into the double backer.[24] The first stage of the double backer, comprised of a long series of steam heated plates, applies heat to set the adhesive.[25] This section's ballast rollers exert sufficient pressure on the combined plys to insure a satisfactory heat transfer rate. Upon leaving the heating section, the combined board enters the cooling area where pressure is continued until the bond is secured. (D.Ex. AN) The "strong and rigid" triple wall board then enters the duplex scorer which cuts the board to the desired length.

### The scope of the patent in suit

The fundamental issue in this litigation is the definition of the parameters of the method of production described in

20. Witness Lichtenstein testified that at least eight men were employed in the critical phase of the operation, the application of glue to the single face sheet and its careful placement on top of the double wall board. (Tr. 166)

21. Essentially, all that was required was the addition of a third glue pan, guide roll, and pre-heater drum.

22. The brothers fully expected that the combined three ply board would be comparable in softness to that made by Old King Cole, Roberts, or the manual method, and considered sulfur immersion essential for the finished product's beam strength. (Tr. 175–8)

23. Sodium silicate has today been widely replaced by a starch adhesive. Either provides an instantaneous set and a securely bonded single face sheet.

24. The term "combiner" is replacing "double backer." Although witness Goettsch could offer no explanation for the change in nomenclature, it appears to us that where multiple sheets of single face board are being united, the term is far less confusing than referring to the machine by its original purpose.

25. If the adhesive is a sodium silicate, the set is caused by the loss of water. If a starch adhesive is used, the set results from the starch's gelatinizing. (Tr. 473)

the Tri-Wall patent. The pertinent language of Claim 1 provides:

Triple wall corrugated paper board * * * consisting essentially of four paper liners, three corrugated paper mediums, the mediums being individually interposed between two liners in each instance, and adhesive applied to the ridges of the mediums corrugations and the liners * * * said triple wall corrugated paper board having been made by a single pass of all of said sheets prior to setting of said adhesive simultaneously through a corrugated paper board machine * * *.

Tri-Wall insists that the claim's language accurately reflects the two step method [26] recited above, and concededly employed by Continental in its production of three wall board. (Tr. 596–9) Defendant, however, contends that the claim describes a different method of manufacture, a one step operation, and accordingly no claim of infringement is established.

Continental's principal argument is based on what it alleges to be the natural reading of the claim's terms. The language expressly provides that the board is "made by a single pass of all of said sheets prior to setting of said adhesive simultaneously through a corrugated paper board machine." The relevant wording preceding this suggested method recites that the board consists of "four paper liners, three corrugated mediums * * * and adhesive applied to the ridges of the medium's corrugations." Combining the two phrases, defining "said sheets" with reference to the antecedent words, Continental insists that the "single pass" describes a one step method whereby seven individual sheets, three mediums and four liners, are simultaneously introduced into the double backer and adhesion achieved on the six surfaces (combining the seven sheets) at the same moment.

In support of its contention, defendant points to the absence of any reference in the claim to single face board, or mention of a preliminary bonding of a medium to a liner sheet. Further, the requirement that the "single pass" be accomplished "prior to setting of said adhesive" arguably excludes the possibility of an initial bonding involved in the manufacture of single face.

### File wrapper estoppel

Additionally, Continental alleges that a review of the background of the patent in suit confirms its limited definition of the patent's method, and estops Tri-Wall from now seeking to extend the patent to encompass the two step approach.

The relevant file wrapper history commences with the co-inventor's Divisional Application, S.N. 604,429. (D.Ex. AH) At the outset, they sought to acquire a board product patent and submitted claims simply describing the components of multiple wall board—at least three mediums and four liners. Claims 1–4, D.Ex.AH pp. 12–13. This application was rejected by the examiner in light of prior art recognition "of [the] use of two or more layers of corrugated board." D.Ex.AH p. 17. More sophisticated claims were next submitted describing both the elements of the product and the method of adhesion. Claims 7–11, D. Ex.AH, pp. 26–30.[27] In remarks offered in support of their application, the prospective patentees explicitly described the two step procedure—"single face, corrugated paper was first made and dried and thereafter liquid adhesive was applied to three such layers, and these were superimposed." D.Ex.AH, p. 31. Significantly, these claims were found by the patent examiner to be fairly anticipated: "It is not deemed inventive

---

26. The two-step being the initial production of single face on a single facer followed by the combination of three single face sheets and bottom liner in the double backer.

27. Intervening claims 5 and 6 were found by the examiner as broader than the first four and summarily rejected. D.Ex. AH, p. 20.

to supply still another single-faced corrugated web," in an art recognizing the concept of combining two single face sheets. D.Ex.AH, p. 105. Upon request for reexamination, the patent office maintained its position forcefully stating, "If there is such a critical and patentable distinction in uniting three corrugated layers using the simultaneous uniting procedure as distinguished from uniting two corrugated in this manner * * * such criticallity has not been disclosed in the original specifications," and concluded that the rejection was *"Final."* D.Ex.AH, p. 222–3 (no emphasis added)

Exhibiting once again the same determination alluded to hereinabove, they amended their application, submitting claim 12, which provided in pertinent part:

"Triple wall corrugated paper board made * * * continuously by a single pass * * * of three sheets of single face corrugated paper board and an outer liner sheet * * * said single face sheets being passed through said combining end * * * with adhesive applied to the exposed ridges of their [single faces] corrugations." Claim 12 D.Ex.AH, p. 224.

Although the claim details the two step approach, referring to the combination of three single face sheets, in elaborating the "important concept" of their revelation, the patentees recited "that the discovery of the surprising strength of triple wall corrugated paper board made all at once through the modified corrugated paper board machine" D.Ex. AH, p. 239, and emphasized that "it is new to combine seven sheets in a single pass through the machine." [28] D.Ex.AH, p. 250. The examiner concluded that Claim 12 failed to avoid the objections defeating the previous applications. D. Ex.AH, p. 228, 286—"to add another single facer in tandem would not amount to invention." In affirming the repeated findings of the examiner, the Board of Appeals considered " * * * Greenwood would be a clear teaching of making multiple fiberboard, and we do not think the addition of one more unit of two layers to be patentable * * *." D.Ex.AH, p. 294.

After filing an appeal pursuant to 35 U.S.C. § 145 seeking judicial review of their latest patent office rejection, the inventors reconsidered their position, abandoned the litigation, and continued their assault on the patent office by submitting a continuation application, S.N. 150,618 D.Ex.AI. This application first consisted of two claims, the relevant language of claim 1 providing that:

"Triple wall corrugated paper board consisting essentially of three single face corrugated paper boards and one flat liner sheet * * * said triple wall corrugated paper board having been made by a single pass of all of said sheets prior to setting of said adhesive simultaneously through a corrugated paper board machine * * *."

These claims continued the form of claim 12 of the Divisional Application in that it contained a method limitation unequivocally describing the simultaneous uniting of three single face sheets. The similarity of the claims extended to the reaction of the patent examiner.[29] D. Ex.AI, p. 32.

The two inventors simply cancelled these claims and substituted three "new" claims, generally providing:

"Triple wall corrugated paper board which is flat and adapted for scoring and bending to form a shipping container and consisting essentially of

---

28. Further, in the course of their presentation before the patent office, the patentees chose the following language to describe the proposed method of combination. "The new claim more closely follows the exact words of the specifications as to triple wall being a corrugated paper board machine product made all at once by a single pass through the machine." D.Ex.AH, p. 225. Compare Claim 1, P.Ex. 1.

29. The patentees request for reconsideration met with identical fate. D.Ex.AI, p. 50–1.

four paper liners, three corrugated mediums."

The outstanding feature of this application was the omission of a method limitation,[30] similar to the original broad product patent claims pressed in the Divisional Application. A herculean effort was exerted to obtain approval of this product patent application. After an interview with the examiner, an understanding was apparently reached[31] (D.Ex.AI, p. 199) whereby the patent would be granted on the then pending claims if the inventors would supplement them with a method limitation. Accordingly, the proposed claims were modified to include:

"said triple wall corrugated paper board having been made by a single pass of all of said sheets prior to setting of said adhesive simultaneously through a corrugated paper board machine * * *."

Continental alleges that unlike the method limitations found in earlier applications, the claims of the patent in suit do not clearly teach a two step procedure. Further, defendant insists that the claims as approved intentionally describe a one step operation, achieved by the patentees' addition of the identical language of the method limitation of rejected claim 1, to the rejected product claim 3. The only difference between rejected claim 1 and those which were ultimately granted, is the opening words which detail the individual sheets, rather than describe the components as previously combined single face board. Therefore, Continental concludes, any ambiguity in the claims, when considered in the context of its file wrapper history, is resolved in support of its contention that to overcome repeated rejections of the patent office the inventors inserted a unique manufacturing method —the combination of seven individual sheets simultaneously in a single pass through the double backer.

* * *

The doctrine of file wrapper estoppel was most recently formally set forth by our Supreme Court in Graham v. John Deere Co., 383 U.S. 1, 33, 86 S. Ct. 684, 702, 15 L.Ed.2d 545 (1966).

"It is, of course, well settled that an invention is construed not only in the light of the claims, but also with reference to the file wrapper or prosecution history in the Patent Office. Claims as allowed must be read and interpreted both with reference to rejected ones and to the state of the prior art; and claims that have been narrowed in order to obtain the issuance of a patent by distinguishing the prior art cannot be sustained to cover that which was previously by limitation eliminated from the patent." [citations omitted]

In short, a patent applicant, compelled by the rejection of the patent office to narrow his claims in order to successfully distinguish his innovation from prior art, is estopped, after the patent's issuance, to broadly define his claim to include that which has been relinquished. Smith v. Magic City Kennel Club, Inc., 282 U.S. 784, 789, 51 S.Ct. 291, 75 L.Ed. 707 (1931); Exhibit Supply Co. v. Ace Patent Corp., 315 U.S. 126, 67 S.Ct. 513, 86 L.Ed. 736 (1941); Ling-Temco-Vought Inc. v. Kollsman Instrument Corp., 372 F.2d 263, 270 (2d Cir. 1967). A court cannot inquire whether the patent office was right or wrong in rejecting the original claims, Smith, supra, 282 U.S. at 789, 51 S.Ct. 291, or speculate as to the inventor's motivation for choosing to narrow the scope of his claims rather than seeking full review of the examiner's rejections. International Latex Corp. v. Warner Bros. Co., 276 F. 2d 557, 565 (2d Cir. 1960).

---

30. The only reference to the combining of single face sheets recites that: "adhesive applied to the ridges of the mediums * * * intimately and rigidly bonding the mediums and liners together." D.Ex. AI, p. 56.

31. Despite the voluminous record of the file wrapper, it fails to reveal any information as to the agreement, the most vital aspect of the application.

*The method of manufacture taught by the patent in suit*

Although we find defendant's arguments weighty, we are unconvinced that the wording of the Tri-Wall claims restricts plaintiff's patent to the one step method of production.

[redacted] To establish file wrapper estoppel, it is essential that a prior application be rejected as anticipated by prior art coupled with the subsequent narrowing of the claims to overcome the disallowance. Mastini v. American Telephone & Telegraph Co., 369 F.2d 378 (2d Cir. 1966). The file wrapper history of the patent in suit fails to support a finding that the second prerequisite has been satisfied. The initial claim in the continuation application represented a "product by method" patent. Therefore, it defined the make-up of the product in terms of a proposed method of manufacture; three wall board obtained by the simultaneous bonding of single face sheets. The inventors then shifted the focus of their assault on the patent office in seeking a broad product patent, and accordingly described the product as simply composed of three corrugated mediums interposed between four kraft liners. Upon the examiner's request to include a method limitation, it was not unexpected that the patentees merely amended the then pending claims (detailing the seven sheets) and insert the very wording previously employed in describing the method of production. On such a record, we cannot conclude that there was an intentional relinquishment of the two step method originally claimed nor that the examiner extracted the one step approach from the patentees to avoid the prior art. Katz v. Horni Signal Mfg. Corp., 145 F.2d 961, 963 (2d Cir. 1944). So narrow a reading of the claims as defendant would suggest we find too technical and strict an interpretation. Technical Tape Corp. v. Minnesota Mining & Mfg. Co., 247 F.2d 343 (2d Cir. 1957). Further, it seems clear from the file history of the repeated rejections of claims containing the two step method limitation, that the disallowances were directed to the concept of the patent, the addition of a third sheet of single face board, and not to how the combination of multiple sheets was achieved. The one step method would not have avoided the basis of these rejections. Although we are perplexed as to the reasoning that underlined the examiner's ultimate capitulation by grant of the patent, the persistence displayed by the patentees in refusing to concede the obviousness of their innovation precludes the application of file wrapper estoppel.[32] L. S. Donaldson Co. v. LaMaur, Inc., 299 F.2d 412, 420 (8th Cir.1962).

The allegedly ambiguous language of the claims is clarified when read conjointly with the patent's specifications. United States v. Adams, 383 U.S. 39, 49, 86 S.Ct. 708, 15 L.Ed.2d 572 (1966); Eastern Electric, Inc. v. Seeburg Corp., 164 U.S.P.Q. 97, 101 (S.D.N.Y.1969). The specifications explicitly provide that:

> "In steps previous to those shown [the combining end of the corrugation line] three sheets, 11, 12 and 13 are corrugated and the ridges of the corrugations adhesively secured to liner sheets 14, 16 and 17 thus forming three composite sheets of single face corrugated paper board. P.Ex. 1, col. 2, lines 11–15." [33]

Finally, even restricting our consideration to the express language of the claims, the terms are not inconsistent

32. However, as was pointed out in General Bronze Corp. v. Ward Products Corp., 262 F.Supp. 936, 944 (N.D.N.Y. 1966) this history is not irrelevent in determining the issue of a patent's validity.

"Considerable hesitation, debate and discussion in the Patent Office is significant and may indicate a borderline grant in a crowded art."

33. The specification additionally recites that it is these "three sheets of single face board" that are to be simultaneously combined in the double backer.

with the two step method of production. In either the one or two step procedure, three mediums and four liners are united in a single pass through the corrugation line, and simultaneously combined in the double backer.[34] (Tr. 281) This reading of the claims is strengthened when viewed in the context of prior art which had long recognized producing multiple wall board by uniting single face sheets.[35]

Accordingly, we find the teaching of the patent in suit includes the two step method of production.

### Collateral Estoppel

In Tri-Wall Containers, Inc. v. United States, 408 F.2d 748, 187 Ct.Cl. 326 (1969), the Court of Claims, adopting the report of its appointed trial examiner, found the patent in suit invalid under § 102(b), 35 U.S.C.

"The product of the asserted patent claims is structurally indistinguishable from carefully manufactured triple wall board made according to plaintiff's manual method. Any difference in strength which might exist between these two products results from the greater uniformity and efficiency which can be achieved by machine (double backer) manufacture. The actions of the plaintiff's officers and agents during the period 1952–1953 show that the manually produced product was asserted to have the same desirable properties which plaintiff now uses as a basis for arguing patentability of the wall board claim in the 224 patent. It is concluded that the product defined in the asserted patent claims is not patentably distinguishable from the product of the prior manual process." 408 F.2d at 750

Continental contends that this judgment collaterally estops [36] Tri-Wall from now asserting a claim of infringement of the patent.

The propriety of the use of the doctrine of unilateral collateral estoppel in patent litigation is unsettled. Compare Agrashell Inc. v. Bernard Sirotta Co., 281 F.Supp. 704 (E.D.N.Y.1968) with Technograph Printed Circuits, Ltd. v. Packard Bell Corp., 290 F.Supp. 308 (E.D.Cal.1968). Traditionally, courts have refused to apply res judicata to patent suits, Triplett v. Lowell, 297 U.S. 638, 56 S.Ct. 645, 80 L.Ed. 949 (1936); Aghnides v. Holden, 226 F.2d 949 (7th Cir. 1955), and severely restricted a patent judgment's precedential impact. Maytag Co. v. Hurley Machine Co., 307 U.S. 243, 59 S.Ct. 857, 83 L.Ed. 1264 (1939); Gold Seal Importers, Inc. v. Westerman-Rosenberg, Inc., 133 F.2d 192 (2d Cir. 1943). More recent cases, relied upon by defendant, have rejected the customary approach and denied the patentee the right to repeatedly relitigate identical issues. Technograph, supra; Rains v. Jil-Mic, Inc., 301 F.Supp. 545 (S.D.N.Y. 1969). However, even those cases which have accepted the defense of collateral estoppel have significantly limited its application to situations where the party against whom it is sought to be invoked fails to proffer any different evidence than that presented in the previous

34. Even if we were to find that the claims taught only the one step method, application of the doctrine of equivalents Graver Tank & Mfg. Co., Inc. v. Linde Air Products Co., 339 U.S. 605, 607, 70 S.Ct. 854, 94 L.Ed. 1097 (1950); Reiner v. I. Leon Co., Inc., 324 F.2d 648 (2d Cir. 1963), might lead us to conclude that combining three single face sheets would be insufficient to distinguish the patent and avoid infringement.

35. Defendant's arguments relating to the fatal defect of ambiguity in the wording of the claims is more appropriately raised under § 112, 35 U.S.C.

36. Defendant was not a party to the earlier litigation, and accordingly cannot invoke the prior judgment as res judicata. However, it seeks to use the judgment affirmatively to preclude plaintiff who has enjoyed a full and fair hearing on the validity issue from relitigating the patent claim.

trial.[37] See, e. g. *Technograph, supra,* 290 F.Supp. at 318.

While it may well be the wiser view to reject the strict proscription against application of res judicata and its companion collateral estoppel to patent litigation, in the present factual setting Tri-Wall should not be precluded from pressing its claim. At trial, plaintiff offered significant favorable new evidence bearing on the very issue the Court of Claims relied upon in invalidating the patent. Additionally, the benefit of adopting the doctrine, to avoid repetitious lengthy litigation, is no longer realizable.

■ Accordingly, plaintiff is not barred by collateral estoppel from asserting its claim of infringement.

### § *102(b)—Prior Public Use*

§ 102 sets forth the prerequisites for the issuance of a legally protected patent.

"A person shall be entitled to a patent unless

(b) the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States."

The basis of the Court of Claims' decision, and an argument pressed by defendant at trial, was that plaintiff's pre-sulfur immersed triple ply board, produced in the course of the manual method of manufacture,[38] introduced into public use the teachings of the Tri-

Wall patent some two years prior to plaintiff's patent application.

In attempting to overcome the obvious structural identity between the handmade board and the machine made patented product, plaintiff relies heavily on a series of comparative tests purportedly pointing up the "unusual strength properties" attributable to the machine method of production and absent in the relatively "soft" preimpregnated handmade board.[39] Plaintiff's Post Trial Brief, p. 6.

Results of the Beach test, a measure of the energy provided to puncture a piece of board, proved substantially similar. This finding was not unexpected since both boards contained the same quantity of paper material. (Tr. 187–8) Likewise, in the Pin Adhesion Test, gauging the force necessary to separate the combined single face sheets, the boards measured substantially alike, evidencing comparatively equal bond strength. (Tr. 189)

However, Tri-Wall insists that the two remaining tests demonstrate a significant difference between the two boards. The first, the Short Column test, records the overall strength of a sheet of corrugated board. A section of the triple wall board is placed in a vise-like machine and the load rate determined, the force the upper plate bears against the board as it is compressed. (Tr. 190–1) The maximum load of the machine made board appeared substantially greater than that of the handmade. Finally, the boards were subjected to the Box Compression test which utilizes the identical principle as Short Column;[40] it measured the load rate of a folded carton.

37. An additional consideration is whether this new evidence could have been presented at the earlier trial. Witness Lichtenstein, when questioned on this point could offer no explanation other than "I am not certain whether the Wassaic plant had the test equipment at that time or not." (Tr. 215)

38. The triple wall board relied upon by defendant was the intermediary product of what has been termed by the parties the "hand-made method," described *supra,*

pp. 10–12. This method was implemented by Goldstein in 1950–1952, the patent application was submitted October 2, 1953.

39. In preparing the handmade board for the examination, Tri-Wall followed the original procedure used in its Wassaic plant. P.Ex. II, p. 2–3.

40. The testing machine is simply a larger version of the Short Column device since the specimen being tested is a carton rather than a flat piece of board.

Here again, the box made from the machine made board tested substantially stronger than that composed of preimpregnated board.

Plaintiff contends that this evidence establishes that the unimpregnated board, relied upon by defendant to invalidate the patent, lacked the essential physical strength of the machine made board. Further, it alleges that this different characteristic, produced by a different method of manufacture, created a different use of the product, a paperboard shipping container, the essence of plaintiff's patent.[41]

\* \* \*

█ The aim of § 102(b) is to prevent an inventor from exploiting the secrets of his invention and subsequently seek a legal monopoly only when confronted with the possibility of competition. Pennock v. Dialogue, 2 Pet. 1 27 U.S. 1, 7 L.Ed. 327 (1829); Atlas v. Eastern Air Lines, Inc., 311 F.2d 156, 159 (1st Cir. 1962). The section imposes as a condition to the grant of a lawful monopoly that the inventor act with all due deliberate speed in filing his patent application. Dix-Seal Corp. v. New Haven Trap Rock Co., 236 F.Supp. 914 (D.Conn.1964).

█ In determining whether an earlier product constitutes a prior public use of the innovation disclosed in the patent, courts do not insist upon complete identity, rather "It is enough if the two devices are substantially the same \* \* \* or if the advance from one to the other did not amount to invention \* \* \* but it is not enough that the two devices perform the same function, and are somewhat similar in construction and mode of operation." 1

Walker, Patents, 355–6 (Dellers ed. 1937). Hall v. Macneale, 107 U.S. 90, 2 S.Ct. 73, 27 L.Ed. 367 (1882); Sperry Rand Corp. v. Bell Telephone Labs, Inc., 208 F.Supp. 598 (S.D.N.Y.1962).

On the basis of the evidence before us, we fully agree with the conclusion reached by the Court of Claims that the handmade board is substantially similar to the patented machine made board, and constituted a prior public use. Tri-Wall's focus on the greater strength of the machine board is too narrow. The basic concept of the patent's "invention" is the combination of three sheets of single face to form a packaging container. The handmade board clearly revealed the bonding of three single face sheets, and plaintiffs sought to market it as a shipping container. (Tr. 72–6) Though the method of combination was somewhat different, the ultimate products were structurally indistinguishable.

Further, we are unconvinced that the patented method limitation produced a significantly stronger board. Defendant in the course of trial introduced comparative tests of the two corrugated boards conducted by the Institute of Paper Chemistry. (D.Ex.BB) Results of these examinations, including the top load Box Compression test [42] found that the manual method produced a board of similar strength. (Tr. 706–7) Tri-Wall sought to minimize the impact of the Institute's findings by pointing out that unlike the method of manufacture of Laminate, defendant in preparing its handmade board samples used a polyvinyl acetate adhesive and achieved bonding "under careful laboratory conditions." Plaintiff's Post Trial Reply Brief, p. 19. Tri-Wall, while insisting that the ma-

41. Plaintiff seeks to distinguish the two boards on the additional grounds that the handmade board was never intended as a final product, that it was devised as a "stop gap" measure after the Roberts debacle, and that the pre-immersed board would not infringe the claims of the patent in suit. Plaintiff's Post Trial Brief, pp. 11–12. The short answer to these contentions is that the pre-immersed board was itself in commercial use (Tr. 72–6) for a least two years (Tr. 81–2), and that complete identity is not necessary to defeat a patent under § 102(b).

42. The results of this test revealed an insignificant variance of 3.3%. (Tr. 711) Similarly, in the "Edgewise Compression" test (Short Column), the difference in load rate between the two boards was only 1.2%. (Tr. 212)

chine method surprisingly produced a board with "unique" strength, failed to offer any explanation as to the cause of the quality. We consider Continental's alleged deviation in producing its specimens of handmade board, the application of "pressure in order to bring about an adequate bond" (Tr. 727), as elucidating the source of any difference in structural strength. The mechanical method of manufacture exposed the combined board to heat, pressure and cooling in the double backer to eliminate moisture and obtain a more secure bond. Prior thereto, each method of production directly conveyed the combined three wall board into the sulfur bath.[43] Accordingly, the only significant difference which may have existed between the two boards, accounting for any greater beam strength, was the quality of the adhesive bond. The Court of Claims apparently recognized this distinction by finding prior use from the "carefully manufactured triple wall board made according to plaintiff's manual method. * * *" 408 F.2d at 750. This difference is insufficient to distinguish the two products and avoid application of § 102(b). *Dix-Seal Corp., supra,* 236 F.Supp. at 918–919. The further improvement of triple wall board resulting from the more extensive use of the double backer to secure a better bond, does not attain "patentable novelty" International Tooth Crown Co. v. Gaylord, 140 U.S. 55, 11 S.Ct. 716, 35 L.Ed. 347 (1891), or constitute a non-obvious development to one skilled in the art. (Tr. 239) Tool Research & Engineering Corp. v. Honcor Corp., 367 F.2d 449, 454 (9th Cir. 1966).

### Experimental use

█ A judicial modification grafted to the § 102(b) requirement of seasonable disclosure, allows the prospective patentee a reasonable period of time to engage in experimentation to perfect his invention. City of Elizabeth v. American Nicholson Pavement Co., 97 U.S. 126, 24 L.Ed. 1000 (1877); Lyon v. Bausch & Lomb Optical Co., 224 F.2d 530, 534 (2d Cir. 1955), cert. denied, 350 U.S. 911, 76 S.Ct. 193, 100 L.Ed. 799 (1955), reh. denied, 350 U.S. 955, 76 S. Ct. 341, 100 L.Ed. 831 (1956). Tri-Wall asserts that the public exposure of its handmade board falls squarely within this exception.

As evidence of its alleged experimental use, plaintiff relies on the language employed by its salesman, E. H. Waldorf, repeatedly referring to "experimental purposes," "experiment," or "test," in covering letters accompanying the delivery of the unimpregnated board. D.Ex.E–P. Further, plaintiff contends that each shipment contained an insignificant amount of paper board, and did not involve a commercial transaction because the entire cost was underwritten by Tri-Wall. Plaintiff's Post Trial Brief, p. 17–8.

The Waldorf letters cannot be read as reflecting a desire on the part of Tri-Wall to experiment with its product to test its capabilities; rather it was an open invitation by plaintiff for prospective customers to "experiment" with the handmade board with the hopeful expectation of creating future demand for the product. The traditional elements of experimentation, the conducting of tests and compilation of data looking towards refinement of the board, or, for that matter, any other convincing proof, are absent from the facts before us. We cannot characterize the nature of plaintiff's unrestricted shipments as the type of experimentation recognized by our court.[44] City of Elizabeth, *supra*; Westinghouse Electric & Mfg. Co. v. Saranac Lake Electric Light Co., 108 F. 221 (N.D.N.Y.1901), aff'd, 113 F. 884 (2d Cir. 1902). Further, the magnitude of the prior use or sale is of no consequence, for "one sale or gift of an arti-

43. See f. n. 10, *supra.*

44. The testimony of witness Goldstein (Tr. 122, 136) does not lead us to conclude otherwise. Even if we were to assume that every shipment contained only samples, that is not synonymous with experimentation.

cle is sufficient to constitute a sale or public use." *Tool Research, supra,* 367 F.2d at 453; Consolidated Fruit-Jar Co. v. Wright, 94 U.S. 92, 24 L.Ed. 68 (1876).

■ Accordingly, we find that the handmade triple wall impregnated board was a nonexperimental prior public use of the patented machine made board.

## § 103—Obviousness

35 U.S.C. § 103 establishes the standard by which an application is to be judged in determining whether the patent's teachings constitute a patentable innovation. It provides that:

A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains.

In Graham v. John Deere Co., 383 U.S. 1, 17–18, 86 S.Ct. 684, 694, 15 L.Ed.2d 545 (1966), the Supreme Court formally outlined the approach a court is to pursue in resolving the validity of a patent challenged under this section:

* * * under § 103 the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved. Against this background, the obviousness or non-obviousness of the subject matter is determined.

*Corrugated paper board industry*

This industry originated in 1870 with the issuance of the Jones patent and the use of unlined corrugated paper as a protective material for packaging such fragile articles as lamp chimneys. (Tr. 291, 444) It was just a short step to the addition of a flat liner to the corrugated medium (single facer) and the marketing of single face board—the Simplex wrapper. (Tr. 291) Like the unlined board, the Simplex had little beam strength and its use was limited to cushioning fragile goods shipped in wood containers. (Tr. 445)

In 1890, with the addition of a bottom liner sheet (single wall), the industry developed the "express box," the first paper container having dimensional stability, and sought to compete with wood in the container market. (Tr. 446)[45] The initial commercial breakthrough occurred at the turn of the century when cereal manufacturers began shipping cereal by railroad freight in single wall corrugated containers. The emerging industry met strong resistance from the railroads that imposed higher freight charges for goods packaged in paper board; the carriers insisted that the board was inferior to wood and would increase claims for damage to goods in shipment. This discriminatory pricing arrangement was abolished in 1914 by the Interstate Commerce Commission in the Pridham case, requiring railroads to accept single wall packaged goods without a penalty charge. (Tr. 294) By World War I, the single wall corrugated box had taken over a considerable portion of the packaging market previously serviced by wood.[46] (Tr. 448–9)

The dearth of materials during the War coupled with the replacement of flour paste adhesive by the quick setting

---

45. Early single face and single wall were made of straw corrugated board and bonded with a cooked flour paste adhesive. This adhesive had an objectionable odor and a slow setting speed. (Tr. 292, 446–7)

46. The strength of the single wall board was increased by the use of heavier liners. To achieve a satisfactory bend on this thicker board, the industry recognized the need to apply heat at the time of setting and so developed a primitive double backer. (Tr. 451)

sodium silicate [47] provided the next great impetus for the industry—the development of double wall corrugated board. (Tr. 295) Although first made by the placement of two single wall boxes "nested together," as early as 1919, the industry utilized a corrugation line composed to two single facers, two glue pans applying sodium silicate to the exposed tips of the fluted medium, a double backer to simultaneously unite two single face sheets with a bottom liner, to produce a double wall box scored for use as a shipping container. (Tr. 296, 451)

The next two decades witnessed further perfection of double wall board and its method of manufacture: the introduction of kraft liner paper,[48] the development of three standard flute sizes,[49] and the standardization of the corrugation line.

### Prior art patents

Continental introduced in the course of trial a host of prior patents in support of its defense that the Tri-Wall claims are simply an unpatentable obvious combination.

Adams, 2,422,998, D.Ex. U, AO, concerned with the manufacture of triple face shaped corrugated board, discloses the uniting of three sheets of single face board by the application of glue to each medium's tips and the exertion of pressure upon the combined board by two interlocking dies. Adams specifically refers to the possibility of adding a fourth liner. (Tr. 494) Although not detailing a continuous operation of producing three ply board, the patent accomplishes simultaneous uniting of multiple single face sheets.[50]

Knight, 1,914,207, pertains to the use of multiple wall corrugated board as an insulator. Although it recites that the individual single face sheets may be loosely placed one atop the other, it reveals that the sheets could be "bonded together, which would lend rigidity to the product." (Tr. 498) Further in Finck, 2,091,918, also relating to insulation, the individual corrugated sheets are directly bonded.[51]

Marc, 2,434,466, diagrams a triple wall structure with two liners bordering each edge of the combined board. Marc teaches the increased strength and rigidity of three ply corrugated board. (Tr. 501) Masters, 2,160,221, demonstrates the use of triple wall board as a protective corner post. While neither reveals a method of producing triple wall board, each recognizes the combination of three corrugated mediums interposed between sheets of liner.

Cumfer, 1,802,880, D.Ex.L, AS, in describing the manufacture of a laminated fibrous corrugated board, combines two sheets of single face and double wall by applying a hot asphalt adhesive, to produce four wall board. Although the bonding results from the cooling of the asphalt, Cumfer clearly reveals the simultaneous uniting of three adhesive surfaces. (Tr. 533–8)

Weber, 2,008,974, D.Ex.W, AR, devised a method of producing a multi-wall corrugated paper board structure with perpendicular fluting of adjoining medi-

47. The quick setting quality allowed the industry to manufacture double wall board on a continuous corrugation line. (Tr. 452–3)

48. Kraft paper, "made from wood which has had a sulfate cook," has high tensile strength. (Tr. 296–8)

49. Witness Goettsch in 1931 sought to develop a board with a high flat crush (resistance to force parallel with the facing sheets) to compete with solid fibres and experimented with a shorter fluting of the corrugated medium. His success lead to the classification of the larger flute size, .185″ height as an A flute, and a B fluting, .097–.103″. The third standard flute size, C, is .141″ in height. (Tr. 454–61)

50. Further, witness Goettsch testified that the uses described in the Adams patent would require a strong and rigid board. (Tr. 492)

51. However, Finck does not detail the method by which the sheets are united, or whether it is accomplished simultaneously. (Tr. 390)

ums. In "attaining"[52] this result, Weber details a method of manufacture (patent figure 7) in which two single face sheets, coated with adhesive, are introduced into a conventional double backer with a third sheet of single face board, positioned so that its flutes are at a right angle with the two surrounding webs. Weber reveals the manufacture of multiple wall corrugated board, to be marketed as a shipping container, (Tr. 521) by the simultaneous combination of sheets of single face board in a double backer.[53] (Tr. 518–9)

Agar, 1,909,513, D.Ex.S, AQ, defining a procedure for the production of multiple ply corrugated board for use as a protective cornerpost, diagrams in patent figure 1 a corrugation line strikingly similar to that taught by the patent in suit. It illustrates five single facers in tandem, application of an adhesive to each line of single face, and the bonding of the five sheets in a mechanism containing separate heating and cooling compartments comparable to the double backer. (Tr. 508) Subsequent figures detailing the proposed method of production disclose that the adhesive is applied to the exposed tips of the medium, the addition of a bottom liner, and the apparatus simultaneously combining the single face sheets is composed of a series of steam heated plates. Further, Weber is concerned with the manufacture of a stiff paper board.[54] (Tr. 387) In fact, the only significant variation between

the two corrugation lines[55] arises from the different end product sought; Agar, in developing an angular post uses in the final stage of production a "V" shaped die, while plaintiff, looking toward a flat sheet, employs a straight die.[56]

Finally, defendant's predecessor, the Syracuse Division of the Robert E. Gair Co., itself produced a triple face board (D.Ex.AY, AY–1) in the late 1930's to be used as an outside container in the transportation of ice cream. (Tr. 563–5) The production line devised by Gair included three single facers, application of adhesive to the corrugated mediums' exposed tips, and the simultaneous uniting of the three single face sheets in a double backer. (D.Ex. AY–1, D 10; Tr. 557–8) Although the use of the board required that the third medium's flutes remain exposed to allow the cool air formed from the dry ice placed above the container to permeate the board and maintain a uniform low temperature so that the ice cream not melt (Tr. 544), a Gair employee diagrammed the simple alteration of the corrugation line, the addition of a fourth, or bottom liner and glue applicator, to produce triple wall board. (D.Ex.AY–D–20, 21)

*Finding of obviousness*

■ Despite the level of accomplishment of the prior art at the time of the patent in suit, Tri-Wall insists that the patent's teachings were not obvious.

52. A problem that had long intrigued the industry was the production of a multiple wall board with flutes running lengthwise or parallel to the travel of the web, on a continuous corrugation line. Weber merely sidestepped the problem by turning his center single face sheet at a right angle. (Tr. 515)

53. The only significant difference from the Tri-Wall patent is that the middle layer is not a continuous sheet of single face board entering the double backer directly from the third single facer.

54. See e. g. D. Ex. S., claim 7: "The process of forming stiff, multi-ply angular, corner protecting members, which includes the steps of bonding to-

gether into nested angular form a plurality of superimposed scored single face corrugated sheets having adhesive therebetween, and subjecting said sheets to heat while said sheets are in bent angular form to permanently set said sheets in angular form."

55. The combination of 3 or 5 single face sheets is not critical. Both recognize the concept of simultaneously uniting multiple sheets of single face in a similar combining mechanism.

56. The Agar, Cumfer and Weber patents were not before the Patent Office when it considered the application of the patent in suit. Defendant's Post Trial Brief, p. 70.

Our review of the entire trial record leads us to conclude that each and every element of the Tri-Wall patent was recognized by the prior art of the paper board industry. The fundamental components of plaintiff's triple wall corrugated board—four paper liners, three corrugated mediums, alternating placement of the liners and mediums, application of an adhesive to the ridges of the parallel mediums' corrugations, height and thickness of each liner and medium— were well known in the industry (Tr. 485-7) and are not relied upon by Tri-Wall as forming the basis of its alleged invention. (Tr. 299-300; Plaintiff's Post Trial Reply Brief, p. 2) Further, we cannot consider the patent's disclosure of a speed-heat ratio of the combined board as it travels through the double backer a significant innovative concept. Although a satisfactory ratio is essential to insure adequate heat to securely set the center adhesive surface without burning the outside liners, the relation would be apparent to a person possessing ordinary skill in the art.[57] (Tr. 348-50, 419-21)

Tri-Wall hopes to establish a finding of invention in its "narrow" method of producing a strong triple wall board, adaptable to a new use as a shipping container. (Plaintiff's Post Trial Brief, p. 60) In support of this contention, plaintiff asserts that although the industry's experts had long sought a strong paper box to compete with wood cartons, they failed to conceive of plaintiff's method of producing three wall board. Tri-Wall points with particular emphasis to witness Goettsch, whose employer would have financially benefited from the purchase of the additional machinery[58] necessary to implement the patent in suit. Plaintiff's Post Trial Brief, p. 52-8. Finally, Tri-Wall contends that the unique strength of its product created a new commercially successful use for corrugated paper board (Plaintiff's Post Trial Brief, p. 63-72), reflected by the amendment of the Uniform Freight Classification (P.Ex. 23) authorizing a gross maximum weight that may be carried by triple wall board of 275 pounds while limiting double wall to a load of 160 pounds.

We find plaintiff's arguments unimpressive. The simultaneous combination of multiple single face sheets and the enhanced strength of combined board produced by the successful bonding of the double backer were both well recognized by prior art. As the Board of Appeals, in the course of plaintiff's proceedings in Patent Office, concluded, a conclusion we fully adopt:

"We do not regard the increased strength as an unexpected result since it would be obvious that if 5 layer fibre box [double wall] is strong, a seven layer box would be still stronger and thus to merely extend layers to get increased strength is a matter of logical expectancy." D.Ex.AH, p. 294.

Further, even if plaintiff achieved a better than anticipated result, we would not find it patentable as it is a natural consequence of the prior art's teachings. *Graham, supra*, 383 U.S. at 14, 86 S.Ct. 684, 15 L.Ed.2d 545.

Plaintiff's repeated emphasis that the patented method produced a product capable of a new use is misplaced. Although the Uniform Freight Classifica-

---

57. In the proceedings before the Patent Office, the speed-heat limitation, initially pressed as a significant element of the alleged invention was eventually termed "unimportant." (Tr. 415-7)

58. The additional equipment, a third single facer and a third glue applicator, was estimated to cost $65,000. (Tr. 633) However, Goettsch did so recommend, (Tr. 622) and many manufacturers added a third single facer to their corrugating line producing double wall to allow continuous operation of their machinery without having to change rolls of a single facer if they wanted a different flute size. Presumably, by a slight adjustment, the three single facer could have operated simultaneously, and therefore the additional equipment necessary to produce triple wall board would only involve the purchase of a glue applicator. Further, there were a few corrugation lines that contained a third glue stand. (Tr. 626-8)

tion recognized the greater weight that a triple wall carton could carry, we cannot ignore the long established practice of transporting goods in double face and double wall corrugated boxes. The triple wall container has not attained the measure of commercial success considered by courts as evidencing novel invention, American Safety Table Co. v. Schreiber, 269 F.2d 255, 260 (2d Cir. 1959) ; Lyon v. Bausch & Lomb Optical Co., 224 F.2d 530 (2d Cir. 1955). Statistics compiled by the Fibre Box Association [59] reveal that in 1968, single and double wall accounted for over 99% of the sales of corrugated board. (Tr. 583) Even including estimates of Tri-Wall's output, of a total of 180 billion square feet of corrugated paper board produced by the industry (Tr. 609), significantly less than 1%, some 450 million square feet,[60] was triple wall board. (Tr. 588–9)

At best, Tri-Wall can be credited with being the first to produce a stronger corrugated board container by adding a third line of single face sheet to the conventional corrugation line. As we see it, this does not constitute a patentable development, Preuss v. General Electric Co., 392 F.2d 29 (2d Cir. 1968) especially where, as here, the alleged invention involves a combination of elements and devices common in the prior art with the resulting danger of removing extant knowledge from the public domain. Continental Can Co. v. Old Dominion Box Co., 393 F.2d 321 (2d Cir. 1968).

### Conclusion

Based on the total trial record before us, we find in contemplation of law that:

1. the patent in suit teaches the "two step" method of manufacture;

2. the plaintiff is not barred by collateral estoppel from prosecuting the pending claims;

3. the handmade unimpregnated board constituted a nonexperimental prior public use invalidating the patent in suit pursuant to 35 U.S.C. § 102;

4. the patent in suit, "obvious at the time the invention was made," is invalid pursuant to 35 U.S.C. § 103.

Therefore, we are constrained and do find the Tri-Wall patent, 3,093,224 invalid.

The Clerk of this Court is directed to enter judgment in favor of defendant Continental Can Co., Inc.

---

59. These figures do not reflect Tri-Wall production because plaintiff does not report to the association.

60. Witness Goettsch estimated that of 586 converting plants (operating corrugation lines) 20 manufacture triple wall board, and only 4–5 run three wall at least once a week. Query, how much business has the patent's revelations brought Goettsch's employer?